UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATIRIA ORTIZ, MARY MOE, whose initials are K.O., JANE DOE, whose initials are I.P., a minor by her Guardian ad Litem KATIRIA ORTIZ, K.O. and KATIRIA ORTIZ, K.O., individually,<br><br>        Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF WOODBRIDGE, its agents, servants and/or employees, DETECTIVE JUAN CARLOS BONILLA, JR., in his official capacity, DETECTIVE Bryan JAREMCZAK, in his official and individual capacity, DETECTIVE SHANE BODNAR, in his official and individual capacity, DETECTIVE PATRICK HARRIS, in his official and individual capacity, DETECTIVE NICOLE HUBNER, in her official and individual capacity, PATROLMAN JEIAN RASTEGARPANAH, in his official and individual capacity, CHIEF LAW ENFORCEMENT OFFICER CAPTAIN SCOTT KUZMA, ROY HOPPOCK, in his official supervisory and individual capacity, DEPUTY POLICE DIRECTOR JOSEPH NISKY, in his official supervisory and individual capacity, POLICE DIRECTOR ROBERT HUBNER, in his official supervisory and individual capacity, et. al.,<br><br>                Defendants. | Civil Action No.: 19-cv-014139<br><br><br><br><br><br><br><br>**RESPONSE TO STATEMENT OF FACTS AND SUPPLEMENTAL STATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1(a)** |

Plaintiffs KATIRIA ORTIZ ("Katiria") and JANE DOE, whose initials are

I.P., a minor by her Guardian ad Litem KATIRIA ORTIZ ("I.P") (collectively,

"the Plaintiffs"), via their undersigned attorney, hereby provides their responses to the below-referenced Defendants Statements of Material Facts on their respective motions for summary judgment, as well as their own counterstatement of material facts in opposition to these motions for summary judgment pursuant Local Civil Rule 56.1(a):

<u>**Plaintiffs' Response to Defendants TOWNSHIP OF WOODBRDIGE ("Woodbridge"), CAPTAIN SCOTT KUZMA ("Kuzma") POLICE DIRECTOR ROBERT HUBNER ("Director Hubner")  and DEPUTY POLICE DIRECTOR JOSEPH NISKY's ("Nisky") (collectively, "the Woodbridge Defendants") Statement of Material Facts Dated September 4, 2024**</u>

1. This statement contains no citation to a record document, and constitutes a statement of legal argument, making it an improper statement of facts pursuant to Local Civil Rule 56.1(a), and as such no response is required.  However, in the interests of economy, it is admitted that Woodbridge is a public entity under the New Jersey Tort Claims Act ("TCA").

2. This statement contains no citation to a record document, and constitutes a statement of legal argument, making it an improper statement of facts pursuant to Local Civil Rule 56.1(a), and as such no response is required. However, in the interests of economy, it is admitted that Kuzma, Director Hubner, and Nisky are public employees under the TCA.

3. Admitted that Kuzma, Director Hubner, and Nisky had no operational involvement in the execution of the search warrant at 124 Adamecs.  Denied

2

insofar as there is an issue of fact as to whether Director Hubner and Kuzma were involved in the **training** of the Defendants officers, which lies at the heart of Plaintiffs' <u>Monell</u> claim in Count 7 of the Third Amended complaint. (<u>See</u> **Exhibit "1"** at Count 7; **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11).

4. Admitted.

5. Admitted.

6. Admitted that Officer Defendants were all members of the SIU. Denied insofar as the testimony in this matter indicates that Defendant Sergeant James Bodnar ("Bodnar") was the supervising officer of this unit. (<u>See</u> **Exhibit "3"** at 25:22-26:1).

7. Admitted as to what is stated in the Third Amended complaint, which speaks for itself. Denied insofar as this statement of "facts" is in fact a statement of legal argument in violation of Local Civil Rule 56.1(a) for which no response is required. Denied that anything in the Third Amended complaint entitles the Woodbridge Defendants to summary judgment.

8. Admitted as to what is stated in the Third Amended complaint, which speaks for itself. Denied insofar as this statement of "facts" is in fact a statement of legal argument in violation of Local Civil Rule 56.1(a) for which no response is required. Denied that anything in the Third Amended complaint entitles the Woodbridge Defendants to summary judgment.

9. Admitted as to what is stated in the Third Amended complaint, which speaks for itself. Denied that anything in the Third Amended complaint entitles the Woodbridge Defendants to summary judgment.

10. Admitted as to what is stated in the Third Amended complaint, which speaks for itself. Denied that anything in the Third Amended complaint entitles the Woodbridge Defendants to summary judgment.

11. Admitted as to what is stated in the Third Amended complaint, which speaks for itself. Denied that anything in the Third Amended complaint entitles the Woodbridge Defendants to summary judgment.

12. Admitted that Plaintiff has not identified a particular **policy** responsible for the violation of her rights. Denied insofar as Plaintiff's <u>Monell</u> claim is based on a failure of **training and supervision**, which is evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (<u>See</u> **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15, 24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

13. Admitted that Plaintiff has not identified a particular **policy** responsible for the violation of her rights. Denied insofar as Plaintiff's <u>Monell</u> claim is based on a failure of **training and supervision**, which is evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (<u>See</u> **Exhibit**

**"3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15, 24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

14. Denied insofar as Plaintiff's <u>Monell</u> claim is based on a failure of **training and supervision**, which is evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (<u>See</u> **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15, 24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

15. Denied. The failure of training and supervision supporting Plaintiff's <u>Monell</u> claim and negligent hiring/training/supervision claims is evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (<u>See</u> **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15, 24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

16. Denied. There is an issue of fact as to whether the Defendant Officers received sufficient training and supervision, as evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (<u>See</u> **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15,

24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

17. Denied. There is an issue of fact as to whether the Defendant Officers received sufficient training and supervision, as evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (See **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15, 24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

18. Denied. There is an issue of fact as to whether the Defendant Officers received sufficient training and supervision, as evidenced by deposition testimony of the Defendant officers and Plaintiff's expert report. (See **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15, 24:13-22, 25:25-26:12, **Exhibit "18"** at 33:23-34:10, 34:14-15, 34:19-35:11; **Exhibit "20"**).

19. Denied as a gross mischaracterization of the Plaintiff's liability report. In an extensive and detailed 35-page report, Oswald sets forth the documents he reviewed, particular rules/statutes/cases/guidelines governing his opinions and articulates in detailed fashion his opinion on how the Officer Defendants' conduct and mistreatment of Katiria were violations of well-established police

guidelines and were the result of grossly inadequate training and supervision, not just by Bodnar and Bonilla, but as a whole. (<u>See</u> **Exhibit "20"**).

20. This statement contains no citation to a record document, and constitutes a statement of legal argument, making it an improper statement of facts pursuant to Local Civil Rule 56.1(a), and as such no response is required.  To the extent that a response is required, denied for reasons set forth in Plaintiff's brief in opposition.

21. Denied.  The attached document is simply of some emails and supposed confirmations showing attendance at alleged training and provides no meaningful detail on the nature of the training and Bonilla's response to it. Further, this contradicted by Bonilla's sworn testimony that he could not remember having formal training on bail reform. (<u>See</u> **Exhibit "3"** at 65:13-22, 110:9-111:12).


(THIS SPACE INTENTIONALLY LEFT BLANK)

**<u>Plaintiffs' Response to Defendants BRYAN JAREMCZAK ("Jaremczak"), SHANE BODNAR ("Bodnar"), PATRICK HARRIS ("Harris"), NICOLE HUBNER ("Hubner"), JUAN CARLOS BONILLA, JR. ("Bonilla"), and JEIAN RASTEGARPANAH's ("Rastegarpanah") (collectively, "the Officer Defendants")  Statement of Material Facts Dated September 19, 2024</u>**

1. This statement contains no citation to a record document, and constitutes a statement of legal argument, making it an improper statement of facts pursuant to Local Civil Rule 56.1(a), and as such no response is required. However, in the interests of economy, it is admitted that the Officer Defendants are public employees under the TCA.

2. Admitted.

3. Admitted that Katiria was arrested in 2011.  Denied that that this fact has any relevance, since the charges arising out of that arrest were all dismissed. (See **Exhibit "11"**).

4. Admitted that the charges against Katiria arising from of her 2011 arrest were dismissed.  Denied that the dismissal of charges against her entitles the Officer Defendants to summary judgment.

5. Admitted.

6. Admitted.

7.  Denied.  Katiria has denied that he ever lived at 124 Adamecs, and as such there is an issue of fact as to whether Pardo ever lived at this location.  (See **Exhibit "4"** at 56:19-22, 60:14-16; 99:5-7).

8.  Admitted that Katiria and her daughter resided at 124 Adamecs.  Denied insofar as the phrase "was associated with" is meant to indicate that Pardo resided at 124 Adamecs.  Katiria has denied that he ever lived at 124 Adamecs, and as such there is an issue of fact as to whether Pardo ever lived at this location.  (See **Exhibit "4"** at 56:19-22, 60:14-16; 99:5-7).

9.  Admitted that Bonilla requested aa search warrant affidavit for Josh Pardo, his cars, and 124 Adamecs based on his false representations that Josh Pardo resided at this location. Denied that this fact entitles the Officer Defendants to summary judgment.

10. Admitted that the Officer defendants were present at 124 Adamecs on the date and time in question. Denied that their initial arrival was a planned "surveillance" of the property. The Officer Defendants offered conflicting testimony about the specific roles each of them was **supposed** to play both in terms of the overall search, and who was supposed to follow and stop Pardo. (See **Exhibit "3"** at 42:16-43:12 [testifying that basic plan was to have everyone involved in motor vehicle stop **and** search, and thus there was no plan for Hubner—the only female officer on the operation—to stay with the house];

9

Exhibit **"6"** at 30:10-31:1 [testifying that decision on who followed Pardo was spur of the moment]; **Exhibit "7"** at 36:18-37:3 [testifying that Harris, Hubner and Rastegarparnah were assigned to follow Pardo and execute vehicle stop]; **Exhibit "8"** at 43:7-14 [testifying that Harris and Bodnar were the ones assigned to stop team]; **Exhibit "9"** at 22:3-25 [testifying that Rastegarpanah and Hubner were assigned to be backup/standby]; **Exhibit "10"** at 29:15-23, 32:1-32:25 [testifying that Rastegarpanah and Hubner were assigned to do surveillance]).

11. Denied as an incomplete statement of the facts surrounding the traffic stop. The testimony shows that Harris attempted to initiate a motor vehicle stop for which Pardo refused to stop, which resulted in a pursuit involving Defendants Harris, Bodnar, Hubner and Rastegarparnah over the crowded Route 9 bridge before Pardo stopped at an exit ramp. (See **Exhibit "7"** at 47:23-48:6, 49:10-17, **Exhibit "8"** at 43:15-23, 45:5-46:1, 47:6-17; **Exhibit "9"** at 28:15-25, 29:4-11; **Exhibit "10"** at 35:9-36:5, 37:2-8).

12. Denied as an incomplete statement of the facts surrounding the traffic stop. The testimony shows that Harris attempted to initiate a motor vehicle stop for which Pardo refused to stop, which resulted in a pursuit involving Defendants Harris, Bodnar, Hubner and Rastegarparnah over the crowded Route 9 bridge before Pardo stopped at an exit ramp. (See **Exhibit "7"** at 47:23-48:6, 49:10-17,

**Exhibit "8"** at 43:15-23, 45:5-46:1, 47:6-17; **Exhibit "9"** at 28:15-25, 29:4-11;

**Exhibit "10"** at 35:9-36:5, 37:2-8.  Further denied insofar as Harris admitted

that he did not actually observe Pardo using his phone, raising an issue of fact

as to whether he actually was using said cell phone. (See **Exhibit "7"** at 50:16-

51:23; 55:24-56:6).

13. Denied that Rastegarpanah observed Pardo throwing "a clear plastic bag,

containing numerous smaller clear plastic bags of suspected cocaine packaged

for distribution" during the chase.  Rastegarpanah testified that he saw Pardo

throw "something" out the window, which they later learned was a bag

containing **suspected** cocaine when they went back and recovered it. (See

**Exhibit "9"** at 31:23-32:7).  Further denied insofar as the record shows that

there was no testing done of any substance in this bag at the time of execution,

but rather such testing was done **after** execution. (See **Exhibit "7"** at 31:8-23).

14. Admitted that Bonilla testified he was advised over the radio that Pardo was

using his cell phone (even though no officer actually saw this).  Denied insofar

as whether Bonilla "reasonably believed" Pardo had contacted someone to alert

them of police activity is a statement of legal argument that is not proper under

Local Civil Rule 56.1(a).  To the extent that a response is deemed necessary, it

is denied for reasons set forth in Plaintiff's counter statement of facts and brief

in opposition.

15. Admitted.

16. Denied as an incomplete statement of Bonilla's knowledge. Bonilla testified that he was aware of the prior arrest, but that he was **also** aware that the charges from that arrest had been dismissed. (<u>See</u> **Exhibit "3"** 70:4-7). He also admitted that prior to this incident neither he nor anyone else working for him ever witnessed Katiria selling or delivering suspected illegal substances. (<u>See</u> **Exhibit "3"** at 26:24-27:4).

17. Admitted that Bonilla and Jaremczak rammed the first door to 124 Adamecs in violation of their warrant's explicit knock and announce requirement. Denied insofar as the assertion that Bonilla "reasonably believed that [Katiria] was alerted to their presence, and that evidence would be destroyed," is a patently improper legal argument that is forbidden by Local Civil Rule 56.1(a) for which no response is required. To the extent that a response is deemed necessary, it is denied for the reasons set forth in Plaintiff's counter statement of material facts and brief in opposition.

18. Denied. Bonilla's claim regarding the circumstances of his entry into the bathroom is contradicted by Katiria's testimony concerning that entry (<u>See</u> **Exhibit "4"** at 102:16-103:2, 107:15-25, 104:13-105:1, 105:19-23, 112:14-17, 113:20-22, 112:18-19, 114:8-16, 117:17-118:4, 114:17-23, 118:9-19, 118:20-119:1, 119:2-24, 163:10-15).

19. Denied. Bonilla's claim regarding the circumstances of his entry into the bathroom is contradicted by Katiria's testimony concerning that entry (See **Exhibit "4"** at 102:16-103:2, 107:15-25, 104:13-105:1, 105:19-23, 112:14-17, 113:20-22, 112:18-19, 114:8-16, 117:17-118:4, 114:17-23, 118:9-19, 118:20-119:1, 119:2-24, 163:10-15).

20. Denied. Bonilla's claim regarding the circumstances of his entry into the bathroom is contradicted by Katiria's testimony concerning that entry (See **Exhibit "4"** at 102:16-103:2, 107:15-25, 104:13-105:1, 105:19-23, 112:14-17, 113:20-22, 112:18-19, 114:8-16, 117:17-118:4, 114:17-23, 118:9-19, 118:20-119:1, 119:2-24, 163:10-15).

21. Denied. Bonilla's claim regarding the circumstances of his entry into the bathroom is contradicted by Katiria's testimony concerning that entry (See **Exhibit "4"** at 102:16-103:2, 107:15-25, 104:13-105:1, 105:19-23, 112:14-17, 113:20-22, 112:18-19, 114:8-16, 117:17-118:4, 114:17-23, 118:9-19, 118:20-119:1, 119:2-24, 163:10-15).

22. Denied. Katiria testified that the blood spatter in the bathroom and living room (which was extensive) was not the result of her throwing blood, but the result of blood gushing from broken nose and cut on her face. (See **Exhibit "4"** at 158:7-25).

23. Admitted that the South Amboy Officers provided aid after the Officer Defendants refused to provide any aid beyond giving Katiria a towel.

24. Admitted.

25. Admitted that Katiria refused medical transport from the EMS because she was afraid to leave her house alone with the Officer Defendants, who had still not shown her a warrant.

26. Admitted that Harris, Hubner, Bodnar and Rastergarpanah eventually arrived at different times to 124 Adamecs, thought their testimony is conflicting and unclear as to the precise times they arrived.

27. Denied.  Katiria unequivocally denied that Pardo's bag or any other contraband was in her house at the time of the search. (See **Exhibit "4"** at 120:3-4, 131:15-20, 146:4-17). Furthermore, Bonilla and Jaremczak admitted that they did not observe any drug residue on Katiria or in the shower. (See **Exhibit "3"** at 78:18-21, **Exhibit "6"** at 46:7-13).  In addition, it is undisputed that the alleged chemical test on the supposed back was neither preserved, photographed, or otherwise objectively documented in any way. (See **Exhibit "3"** at 76:2-77:6). As for the cash that Jaremczak allegedly found in a toilet tank, Katiria stated that any cash of that amount must have come from her purse, which was in the closet, along with an invoice for a root canal, which was the reason she had the cash in the first place. (See **Exhibit "4"** at 135:5-11).

28. Denied. Katiria testified that the cash Jaremczak allegedly found in a toilet tank
must have come from her purse, which was in the closet, along with an invoice
for a root canal, which was the reason she had the cash in the first place. (See
**Exhibit "4"** at 135:5-11).

29. Admitted.

30. Admitted that Plaintiff was improperly charged via a complaint warrant in
violation of New Jersey's bail reform law. Denied insofar as there is an issue of
fact as to whether the Officer Defendants had probable cause to arrest and
charge Katiria.  Katiria has denied the factual bases for all the charges pressed
against her, raising an issue of fact as to whether the Officer Defendants
established probable cause for her arrest under false pretenses. (See **Exhibit
"4"** at 120:3-4, 131:15-20, 135:5-11, 146:4-17).

31. Admitted that Plaintiff was improperly charged via a complaint warrant in
violation of New Jersey's bail reform law. Denied insofar as there is an issue of
fact as to whether the Officer Defendants had probable cause to arrest and
charge Katiria.  Katiria has denied the factual bases for all the charges pressed
against her, raising an issue of fact as to whether the Officer Defendants
established probable cause for her arrest under false pretenses. (See **Exhibit**
120:3-4, 131:15-20, 135:5-11, 146:4-17).

32. Admitted

33. Admitted that Katiria refused medical treatment at the Police Station because she was still scared and traumatized from the assault and wrongful arrest she had just suffered, and as such was not focusing on her own medical needs.

34. Admitted.

35. Admitted.

36. Admitted

37. Denied insofar as there is an issue of fact as to whether Katiria was struck with a door or Bonilla's gun. Katiria testified that Bonilla struck her in the face with his gun after entering the bathroom and has denied stating to anyone previously that she was struck with the door. (See **Exhibit "4"** at 114:17-23, 118:9-19, 118:20-119:1, 174:1-6).

38. Denied as a gross mischaracterization of Katiria's allocution. In that allocution, Katiria stipulated as to probable cause for the **search and search warrant**, not to probable cause for her arrest. (See Allocution, **Exhibit "21"** to Stoltz Affirmation, at 3:10-8:25).


(THIS SPACE INTENTIONALLY LEFT BLANK)

## **Plaintiffs' Supplemental Statement of Material Facts**

1. This matter arises out of claims made by the Plaintiff relating to allegations of police brutality and misconduct beginning with (but not limited to) excessive force and wrongful arrest by members of the Woodbridge Police Department on June 21, 2018. (<u>See</u> Complaint, **Exhibit "1"** to Stoltz Affirmation).

2. Due to Stipulations and/or orders dismissing certain claims earlier in this litigation, the only remaining claims for this court to address on summary judgment are the following:

    a. Count 1: a 42 U.S.C. § 1983 claim for excessive force against the Officer Defendants and Defendants Kusma, Hubner, and Nisky;

    b. Count 2: a 42 U.S.C. § 1983 claim for denial of medical care against the Officer Defendants;

    c. Count 3: a 42 U.S.C. § 1983 claim for false imprisonment against the Officer Defendants

    d. Count 4: a New Jersey common law assault and battery claim against Defendants Bonilla and Jaremczak;

    e. Count 5: a New Jersey common law claim for sexual assault against Defendants Bonilla and Jaremczak;

    f. Count 6: a 42 U.S.C. § 1983 <u>Monel</u> claim against the Woodbridge Defendants;

17

g.   Count 7: a New Jersey common law negligent hiring/training/supervision claim against Woodbridge;

h.   Count 8: a New Jersey common law intentional infliction of emotional distress claim against Defendants Bonilla and Jaremczak;

i.   Count 9: a New Jersey common law negligent infliction of emotional distress claim against Defendants Bonilla and Jaremczak

j.   Count 10: a New Jersey common law negligence claim against Defendants Bonilla and Jaremczak

k.   Counts 17 and 18: New Jersey Common law *per quod* claims for medical expenses and loss of companionship.

(See **Exhibit "1"** at ¶¶92-168, 199-205; Docket No. 13 (Stipulation dismissing claims against Defendants from Town of South Amboy); Docket No. 38 (order dismissing certain counts); Docket No. 52 (order dismissing certain counts); Docket No. 82 (order dismissing certain counts)).

3.   These claims arise with the June 21, 2018 execution of a search warrant at 124 Adamecs Way, Perth Amboy, New Jersey ("124 Adamecs") and the subsequent filing of criminal charges against Katiria. (See Complaint Warrant Dated June 21, 2018, **Exhibit "2"** to Stoltz Affirmation).

4.   This warrant and subsequent arrest allegedly arose out of an investigation into the activities of Katiria's ex-husband, Joshua Pardo ("Pardo"), which began

approximately a month before June 21, 2018 with controlled purchases of cocaine. (See Excerpts of Bonilla's Deposition Transcript dated February 2, 2023, **Exhibit "3"** to Stoltz Affirmation, at 24:9-21; 26:16-20).

5. Bonilla, the lead detective on the investigation, claimed that during his investigation, he saw Pardo entering and leaving 124 Ademecs and staying overnight and based on these alleged observations concluded that Pardo was residing at this location. (See **Exhibit "3"** at 21:20-22:1, 29:5-30:22).

6. Suspiciously, however, Bonilla admitted that he authored no contemporaneous surveillance reports regarding these alleged observations. (See **Exhibit "3"** at 29:5-30:22).

7. Bonilla also admitted that he did not use GPS tracking or cell phone tracking to determine residence. (See **Exhibit "3"** at 31:17-33:9).

8. Bonilla's claims that Pardo resided at 124 Adamecs is contradicted by Katiria, who testified that she had been divorced from Pardo since 2014.  (See Excerpts from Katiria's Deposition, **Exhibit "4"** to Stoltz Affirmation, at 57:18; see also Judgment of Divorce, **Exhibit "5"** to Stoltz Affirmation).

9. Katiria further testified the Pardo never lived at 124 Adamecs, nor did he keep any clothing at that address. (See **Exhibit "4"** at 60:14-16; 99:5-7).

10. Katiria further testified that at the time when Bonilla was falsely certifying to a Judge that Pardo resided at 124 Adamecs, Pardo was in fact living with his father at a different address in Perth Amboy. (See **Exhibit "4"** at 56:19-22).

11. Katiria further testified that at the time, she and her daughter I.P. were the only people residing at 124 Adamecs. (See **Exhibit "4"** at 99:8-11).

12. It is undisputed that during the investigation leading up to the knock and announce warrant execution on June 21, 2018, Katiria was never observed possessing, selling, or transporting cocaine. (See **Exhibit "3"** at 26:24-27, 77:15-21; Excerpts of Jaremczak's Deposition, **Exhibit "6"** to Stoltz affirmation, at 20:13-20; Excerpts from Harris' Deposition, **Exhibit "7"** to Stoltz Affirmation, at 25:25-26:3; Excerpts from Bodnar Deposition, **Exhibit "8"** to Stoltz Affirmation, at 34:8-14; Excerpts from Rastegarpanah Deposition, **Exhibit 9"** to Affirmation, at 21:6-22:1; Excerpts from Hubner Deposition, **Exhibit "10"** to Affirmation, at 26:1-8).

13. It is undisputed that Katiria had no prior indictable criminal convictions at the time of the warrant execution. (See **Exhibit "4"** at 48:24-49:17, 72:16-18; see also Katiria's Criminal History, **Exhibit "11"** to Stoltz Affirmation).

14. Bonilla admitted that he was aware Katiria had no prior indictable convictions prior to executing the warrant. (See **Exhibit "3"** at 62:9-18).

15. Bonilla testified that prior to obtaining and executing the warrant, he was aware that Pardo and Katiria had a child in common, thus demonstrating that he knew or should have known that a minor could potentially be present at 124 Adamecs on the date of the improper execution of the search warrant obtained with a false certification. (See **Exhibit "3"** at 24:22-25:8).

16. On June 13, 2021, Bonilla submitted an affidavit to the Middlesex County Criminal court seeking a warrant to search 124 Adamecs (again, based on false testimony concerning Pardo's supposed residence at this location) along with several vehicles allegedly belonging to Pardo. (See Search Warrant Affidavit, **Exhibit "12"** to Stoltz Affirmation).

17. Bodnar, the supervising officer on the investigation, admitted he did not read the affidavit or otherwise review Bonilla's application for search warrant, despite previously testifying that it would be among his duties to supervise such events. (See **Exhibit "3"** at 25:22-26:1; **Exhibit "8"** at 22:5-13; 34:17-35:6)

18. As a result of this affirmation, Bonilla was granted a **knock and announce** warrant for 124 Adamecs, as well as warrants to search two vehicles. (See Search Warrants, **Exhibit "13"** to Stoltz Affirmation).

19. Officer Bonilla admitted that the Officer Defendants were aware that the warrant for 124 Adamecs was a knock and announce warrant. (See **Exhibit "3"** at 48:23-49:6).

20. While the Officer Defendants generally agree that an operational briefing was held prior to the execution of the warrant, they provided inconclusive and/or contradictory testimony as to **when** this briefing was held, and whether a **written operational plan** was provided/reviewed at this briefing. (See **Exhibit "3"** at 32:20-24 [testifying that operational brief was conducted several days before execution], 34:12-18 [testifying that there was no written operational plan]; **Exhibit "6"** at 24:9-25:13 [testifying no specific memory of briefing, but prior experience dictated it would be held day of/day before, and that written operational plan would be reviewed]; **Exhibit "7"** at 26:4-27:13 [testifying that there was an operational briefing, but has no specific memory of it]; **Exhibit "8"** at 36:1-37:10 [testifying that a briefing occurred and that a written operational plan was circulated and approved, but no specifics on when the briefing occurred]; **Exhibit "9"** at 23:4-24:4 [testifying that briefing was held day of execution, does not know personally if a written operational plan was circulated]; **Exhibit "10"** at 29:6-30:9 [testifying there was an operational briefing before the execution, but not being 100% sure whether there was a written plan]).

21. According to testimony the Officer Defendants, the plan was to let Pardo leave in his vehicle, do a motor vehicle stop, and then begin executing the warrants. (See **Exhibit "3"** at 37:8-15; **Exhibit "7"** at 36:18-37:3).

22. Despite the fact that this operation was taking place in South Amboy, the Officer Defendants did not seek assistance from the South Amboy Police or notify them that they were going to be executing a warrant in their jurisdiction. (See **Exhibit "7"** at 37:20-24; **Exhibit "8"** at 37:16-38:9).

23. The officers offered conflicting testimony about the specific roles each of them was **supposed** to play both in terms of the overall search and who was supposed to follow and stop Pardo. (See **Exhibit "3"** at 42:16-43:12 [testifying that basic plan was to have everyone involved in motor vehicle stop **and** search, and thus there was no plan for Hubner—the only female officer on the operation—to stay with the house]; **Exhibit "6"** at 30:10-31:1 [testifying that decision on who followed Pardo was spur of the moment]; **Exhibit "7"** at 36:18-37:3 [testifying that Harris, Hubner and Rastegarparnah were assigned to follow Pardo and execute vehicle stop]; **Exhibit "8"** at 43:7-14 [testifying that Harris and Bodnar were the ones assigned to stop team]; **Exhibit "9"** at 22:3-25 [testifying that Rastegarpanah and Hubner were assigned to be backup/standby]; **Exhibit "10"** at 29:15-23, 32:1-32:25 [testifying that Rastegarpanah and Hubner were assigned to do surveillance]).

24. On the date of the search, the Officer Defendants claim that they observed Pardo leaving 124 Adamecs, and Defendants Harris, Bodnar, Hubner and Rastegarparnah began following him. (See **Exhibit "6"** at 29:15-30:6; **Exhibit**

**"7"** at 39:16-40:2; **Exhibit "8"** at 43:15-23; **Exhibit "9"** at 28:15-25; **Exhibit**

**"10"** at 32:6-16, 34:16-35:2).

25. Katiria testified that while Pardo had come to and left from 124 Adamecs on the

date of the search, he had come there for the purposes taking her car (which was

in his name per their agreement at the time of divorce) to the Motor Vehicle

Commission to address a registration issue. (See **Exhibit "4"** at  100:9-13).

26. Defendant Harris then attempted to initiate a motor vehicle stop, but Pardo

refused to stop, leading to a high-speed chase involving Defendants Harris,

Bodnar, Hubner and Rastegarparnah over the crowded Route 9 bridge before

Pardo stopped at an exit ramp. (See **Exhibit "7"** at 47:23-48:6, 49:10-17,

**Exhibit "8"** at 43:15-23, 45:5-46:1, 47:6-17; **Exhibit "9"** at 28:15-25, 29:4-11;

**Exhibit "10"** at 35:9-36:5, 37:2-8).

27. During this chase, Officer Harris communicated over the radio that Pardo was

using his cell phone, but later admitted in his deposition that **he did not see a**

**cell phone in Pardo's hand**. (See **Exhibit "7"** at 50:16-51:23; 55:24-56:6).

28. Bonilla testified that he first attempted to catch up to this pursuit, but then

returned to 124 Adamecs in his car, leaving him and Jaremczak as the only

officers left at that location. (See **Exhibit "3"** at 45:12-46:2).

29. Upon returning to the location Bonilla and Jaremczak entered 124 Adamec by

using a ram on the bottom door without first announcing themselves, plainly

ignoring the warrant's knock and announce requirements. (See **Exhibit "3"** at 47:19-49:10; **Exhibit "6"** at 32:18-33:11).

30. Jaremczak (who was wielding the ram) testified that he took it upon himself to ram the door without announcing because he heard someone "bounding" up steps inside 124 Adamecs and that **he did not discuss this with Bonilla before ramming the door**. (See **Exhibit "6"** at 33:12-15, 33:25-34:23)

31. Bonilla, on the other hand, claims that Jaremczak told him prior to entry that he had heard someone bounding up the stair (See **Exhibit "3"** at 50:13-16).

32. Jaremczak's claims of hearing phantom "steps" up the stairs is contradicted by Katiria's testimony that the soundproofing at 124 Adamecs is good because the apartment is located near a train station. (See **Exhibit "4"** at 110:18-111:2).

33. Jaremczak's claims of hearing phantom "steps" up the stairs is contradicted by Katiria's testimony that she was showering at the time of the Officer's entry into her home. (See **Exhibit "4"** at 104:13-105:1, 105:19-23, 112:14-17, 113:20-22).

34. Upon entry, Bonilla and Jaremcyzak came upon a room with a washer and a set of stairs leading to a second door, which they promptly rammed without knocking, announcing, or even checking to see if the door was locked. (See **Exhibit "6"** at 35:15-36:22).

35. After quickly clearing the second floor, Bonilla and Jaremcyzak proceeded to the third floor, where they split up, with Bonilla heading right into Katiria's bedroom, and Jaremcyzak heading left into I.P.'s room. (See **Exhibit "6"** at 37:22-38:6).

36. As a result, Jaremcyzak claims he was not present for Bonilla's entry into the master bathroom, though he admits that he arrived at the third-floor bathroom immediately after the entry. (See **Exhibit "6"** at 37:22-38:6, 38:18-25).

37. Bonilla claims that as he got to the third floor and turned right, he heard running water coming from the master bathroom. (See **Exhibit "3"** at 51:18-24).

38. This is contradicted by Jaremcyzak, who said he could not hear running water. (See **Exhibit "6"** at 37:18-21).

39. Bonilla claims that when he came to the bathroom door, he shouted "police" and "search warrant", knocked on the door, and attempted to open the door but it was locked. (See **Exhibit "3"**, 52:2-5).

40. Bonilla claims that upon not hearing a response after a few seconds, he kicked in the bathroom door, which he claims struck plaintiff and knocked her to the ground. (See **Exhibit "3"** at 51:25-53:4).

41. Bonilla admits that he did not actually see the door hit Katiria. (See **Exhibit "3"** at 53:17-54:9).

42. Bonilla's claim regarding the circumstances of his entry into the bathroom is contradicted by Katiria's testimony that about 15 minutes after Pardo had left with her vehicle, she received a call from him stating simply that he was being pulled over, but then the call was cut off. After calling back, she heard nothing, and assuming nothing was wrong, went on with her morning routine. (See **Exhibit "4"** at 102:16-103:2).

43. Bonilla's claim regarding the circumstances of his entry into the bathroom is further contradicted by Katiria's testimony that about **20-30 minutes after Pardo's cut off call**, she was in the middle of taking a shower when she heard her dogs barking crazily. (See **Exhibit "4"** at 104:13-105:1, 105:19-23, 112:14-17, 113:20-22).

44. Bonilla's claim regarding the circumstances of his entry into the bathroom is further contradicted by Katiria's testimony that when she heard the dogs barking, she got out of the shower, patted herself dry, but before she could do anything else, the door exploded open, and she was immediately struck in the face seconds after the door opened. (See **Exhibit "4"** at 112:18-19, 114:8-16, 117:17-118:4).

45. Bonilla's claim regarding the circumstances of his entry into the bathroom is further contradicted by Katiria's testimony that she was not struck by the bathroom door. (See **Exhibit "4"** at 114:17-23).

27

46. Bonilla's claim regarding the circumstances of his entry into the bathroom is further contradicted by Katiria's testimony that Bonilla struck her in the face with his gun upon entering the bathroom. (<u>See</u> **Exhibit "4"** at 118:9-19, 118:20-119:1).

47. Bonilla's claim regarding the circumstances of his entry into the bathroom is further contradicted by Katiria's testimony that after being knocked to the ground after being struck by Bonilla's gun, she looked up and saw Bonilla with a gun right in her face and Jaremczak standing next to him holding a battering ram (<u>See</u> **Exhibit "4"** at 119:2-24, 163:10-15).

48. Finally, Bonilla's claim regarding the circumstances of his entry into the bathroom is further contradicted by Katiria's testimony that bathroom door in question **had no lock**. (<u>See</u> **Exhibit "4"** at 107:15-25).

49. It is undisputed that when Bonilla and Jaremczak entered the third-floor bathroom, Katiria was on the ground naked and bleeding profusely from the nose. (<u>See</u> **Exhibit "3"** at 53:17-54:12 ; **Exhibit "4"** at 119:25-120:2, 158:17-25; **Exhibit "6"** at 39:1-9).

50. Bonilla and Jermczak admitted that they did not observe any drug residue on Katiria or in the shower. (<u>See</u> **Exhibit "3"** at 78:18-21, **Exhibit "6"** at 46:7-13).

51. Bonilla and Jaremczak claim they calmly asked her to go to the bedroom and get dressed, and she did. (See **Exhibit "3"** 54:23-55:3, 55:14-17; **Exhibit "6"** at 39:24-40:22).

52. This is disputed by Katiria, who testified that she was physically taken from the bathroom and placed on the bed naked. (See **Exhibit "4"** at 120:22-122:1).

53. Katiria further testified when she asked what they were doing, they told her to "shut the fuck up, [they] don't have to answer [her] questions," and when she asked to see the warrant, they refused to show it to her and accused her of being "nasty." (**Exhibit "4"** at 122:2-8, 122:9-17).

54. Katiria further testified that she had to ask several times before Bonilla and Jaremczak would even give her a t-shirt to wear. (See **Exhibit "4"** at 121:11-23).

55. It is undisputed that Plaintiff was not permitted to get fully dressed until Rubner arrived, searched her, and then supervised her getting dressed. (See **Exhibit "10"** at 46:12-20).

56. Bonilla and Jaremczak claim that while they were waiting for other officers to arrive, Katiria threw some of the blood from her nose on them. (See **Exhibit "3"** at 87:23-89:18; **Exhibit "6"** at 40:23-41:7).

57. It was admitted that despite this claimed flinging of blood, Katiria was not handcuffed. When asked why this was so, Jaremczak testified nonsensically

that this was because they did not have gloves on them, despite the fact that the entire reason they were at that location was to execute a search warrant, a process that would by definition require gloves. (See **Exhibit "6"** at 41:8-10, 41:17-21).

58. Bonilla and Jaremczak's claims are further contradicted by Katiria's testimony that the blood spatter in the bathroom and living room (which was extensive) was not the result of her throwing blood, but the result of blood gushing from broken nose and cut on her face. (See **Exhibit "4"** at 158:7-25).

59. Eventually, Hubner and Rastegarpanah came to 124 Adamecs, and after Hubner searched Katiria and watched her get dressed, she was brought to the living room while a search of 124 Adamecs was conducted for approximately one to two hours.(See **Exhibit "9"** at 33:2-12, 33:22-34:2, 34:9-14, 35:20-36:4; **Exhibit "10"** at 41:20-23, 42:11-23, 46:12-47:1, 47:15-22).

60. During this search Jaremczak claims that while searching the third-floor bathroom, he found: 1) a baggie on top of the garbage can that "smelled" like cocaine and had white haze on the bag, 2) a roll of money in the toilet tank (without a bag); and 3) backpack on the floor of the bathroom containing Mr. Pardo's credentials. (See **Exhibit "6"** at 45:13-46:6).

61. A chemical test was purportedly conducted on the residue of the bag, but it is undisputed that the test was neither saved nor the results recorded by video or photo. (See **Exhibit "3"** at 76:2-77:6).

62. Jaremczak admitted that he moved evidence at least once before pictures were taken at the scene, specifically the backpack containing Pardo's credentials. (See **Exhibit "6"** at 49:25-50:2).

63. Katiria unequivocally denied that any Pardo's bag or any other contraband was in her house at the time of the search. (See **Exhibit "4"** at 120:3-4, 131:15-20, 146:4-17).

64. As for the cash that Jaremczak allegedly found in a toilet tank, Katiria stated that any cash of that amount must have come from her purse, which was in the closet, along with an invoice for a root canal, which was the reason she had the cash in the first place. (See **Exhibit "4"** at 135:5-11).

65. When Katiria was eventually treated by EMS and hospital personnel, she was forbidden by the officers to discuss how she obtained her injury, and as such she categorically denies telling medical personnel that she had been struck by a door. (See **Exhibit "4"** at 174:1-6).

66. It is undisputed that Katiria was arrested via a complaint warrant (even though bail reform had already been instituted) on charges of possession of cocaine,

destruction of evidence, money laundering, obstruction of justice, and throwing bodily fluids. (See **Exhibit "2"**).

67. As a result of this arrest, Katiria, a single mother, was detained for a week in solitary confinement before being released without bail conditions set. (See **Exhibit "2"** [indicating no bail conditions set]; **Exhibit "4"** at 130:3-5).

68. As a result of this arrest Katiria lost custody of her daughter, I.P. for a couple of months until the false charges were eventually dropped. (See **Exhibit "4"** at 42:3-12).

69. It is undisputed that Katiria's arrest occurred after bail reform was instituted in New Jersey. (See **Exhibit "7"** at 70:11-14; **Exhibit "8"** at 70:11-14).

70. Under bail reform (which is enacted both by attorney general guidelines and court rules) the presumption is that unless a Defendant is facing a certain level of charges, or other specific requirements are met, they should be released on a complaint summons (which results in no detention other than what is necessary to issue the summons), rather than a complaint warrant (which results in detention until a bail determination is made. (See N.J. Court Rule 3:3-1, **Exhibit "14"** to Stoltz Affirmation (setting for the conditions for a complaint summons versus a complaint warrant); Attorney General Guidelines for Bail Reform Dated October 11, 2016, **Exhibit "15"** to Stoltz Certification).

71. Multiple Officer Defendants (including, but not limited to Bonilla) admitted under oath that they had little or no training on bail reform, and/or that the Woodbridge Police Department had no policies in place to ensure bail reform was being complied with. (See **Exhibit "3"** at 65:13-22, 110:9-111:12, **Exhibit "7"** at 21:10-22:11, 74:14-18, **Exhibit "8"** at 81:6-15).

72. It is undisputed that Katiria was charged pursuant to a complaint **warrant** (rather than a complaint summons, as required by bail reform) prepared and filed by Bonilla. (See **Exhibit "2"**).

73. Bonilla claims that his supervisor (Bodnar) reviewed his application for the complaint warrant. (See **Exhibit "3"** at 74:17-75:1).

74. This is denied by Bodnar, who claimed he took no part in the process of preparing the complaint. (See **Exhibit "8"** 74:1-21).

75. Perhaps sensing the precarious situation he was in because of this clear contradiction, Bodnar submitted a later certification stating, in essence, that on the date of the incident he was acting in compliance with an alleged policy that the complaint be screened by a zone prosecutor. (See Bonilla Certification, **Exhibit "16"** to Stoltz Affirmation).

76. However, when he was deposed in connection with this certification, Bonilla admitted that he had no specific memory of complying with this alleged policy, or of the zone prosecutor reviewing his complaint warrant. (See Excerpts from

Bonilla Deposition Dated May 5, 2024, **Exhibit "17"** to Stoltz Affirmation, at 11:5-12:13, 12:25-13:5).

77. When questioned on why he chose to charge Katiria via a complaint warrant versus a complaint summons, Bonilla stated that the sole basis for this decision was the nature of the charges she was facing. (See **Exhibit "3"** at 67:22-25).

78. However, Bonilla admitted under oath that she was never charged with crimes for which a complaint warrant was presumed. (See **Exhibit "3"** at 70:17-73:25).

79. It is undisputed that the Officer Defendants were members of, or assigned to, the Special Investigations Unit ("SIU"), a specialized unit responsible for narcotics investigations. (See **Exhibit "3"** at 16:19-17:16; **Exhibit "6"** at 12:21-13:18, 14:12-16; **Exhibit "7"** at 18:1-10, 18:18-19:2; **Exhibit "9"** at 23:3-25; **Exhibit "10"** at 14:23-15:13).

80. Bodnar, the supervisor of the Officer Defendants, admitted that he **had not received basic training for narcotics unit management** either at the time he was promoted to narcotics supervisor, or any time prior to his retirement. (See **Exhibit "8"** at 24:13-22).

81. Bodnar also testified repeatedly that he was overwhelmed by the new technology and procedures that were in place when he became sergeant. (See **Exhibit "8"** at 51:10-52:4, 56:21-57:5, 71:13-18).

82. Bodnar admitted that there were times when directives were issued for training, but that he had no idea who was responsible for disseminating them. (See Exhibit "8" at 25:25-26:12).

83. Bodnar testified that he did not manage cases, and that his officers only came to him on major developments in cases. (See Exhibit "8" at 21:22-22: 13).

84. Bodnar admitted he didn't supervise Bonilla when it came to the drafting of the complaint warrant, and that he had no idea whether Bonilla followed proper procedure when he filed the complaint warrant. (See Exhibit "8" at 72:22-73:14, 74:1-21).

85. Woodbridge Training Officer Craig Polhamus ("Polhamus") testified that Kuzma (the Captain and Highest ranked police officer) and Director Hubner (the director of the police force) were responsible for making sure new trainings got done when new guidelines came in. (See Excerpts from Polhamus Deposition Transcript, Exhibit "18" to Stoltz Affirmation, at 33:23-34:10, 34:14-15, 34:19-35:11).

86. Plaintiff's retained Troy E. Oswald ("Oswald") to prepare a liability report in this matter. (See Oswald's Liability Report, Exhibit "19" to Stoltz Affirmation).

87. Oswald is a police practices expert with over 30 years of law enforcement experience in New Jersey, from every position from police officer up to chief of police. (<u>See</u> Oswald's CV, **Exhibit "20"** to Stoltz Affirmation).

88. In an extensive and detailed 35-page report, Oswald sets forth the documents he reviewed, particular rules/statutes/cases/guidelines governing his opinions and articulates in detailed fashion his opinion on how the Officer Defendants' conduct and mistreatment of Katiria were violations of well-established police guidelines, and were the result of grossly inadequate training and supervision. (<u>See</u> **Exhibit "20"**).

Dated:        October 28, 2024        LAW OFFICES ROSEMARIE ARNOLD
<u>/s/ William R. Stoltz</u>
William R. Stoltz, Esq.
Attorneys for Plaintiff
1386  Palisade Avenue
Fort Lee, New Jersey 07024
Tel: 201-461-1111